## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**MARY THOMAS BELL**
**o/b/o AARON BELL,**
        **Plaintiff,**

**v.**                          **Case No:  3:08cv80/MCR/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act") for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Mary Bell, the mother of the minor plaintiff Aaron Bell filed an application for SSI that was denied initially and on reconsideration (tr. 52-55, 60-63, 74-77). On May 15, 2007, following a hearing, an administrative law judge (ALJ) found plaintiff was not under a "disability" as defined in the Act (tr. 15-27). On September 10, 2007, the Appeals Council denied plaintiff's request for review making the decision of the ALJ the Commissioner's final decision, which is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).

This timely appeal followed.

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)). Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed. *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400.

Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

To be considered "disabled" within the meaning of the Act, a child must show he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations," and which either lasts or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i); *Shinn o/b/o Shinn v. Commissioner of Social Security*, 391 F.3d 1276, 1278 (11th Cir. 2004). The Commissioner uses a three step evaluation process to determine disability in children. 20 C.F.R. § 416.924. In this case, the ALJ's finding in the first two steps, that Aaron has not engaged in substantial gainful activity and that he has the "severe" impairments of ADHD, asthma and speech problems (tr. 21-22), are not in dispute. 20 C.F.R. § 416.924(a)-(c).

At step three of the evaluation process, the ALJ must determine whether a child's impairments meet, medically equal, or functionally equal the severity of a listed impairment set forth in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meet the duration requirements. See 20 C.F.R. § 416.924(a) & (d). If they do not, the child will be found not disabled. 20 C.F.R. § 416.924(d).

If the ALJ finds that a child's impairments do not meet or medically equal a listed impairment, the inquiry does not end, however. In such a case, the ALJ

considers whether the child's impairment or combination of impairments result in limitations that "functionally equal the listings." 20 C.F.R. § 416.926a(a). In order to functionally equal the listings, the child's impairment(s) must be of listing-level severity; that is, of six domains of functioning, the impairment(s) "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six domains are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. 416.926a(b)(1)(i)-(vi). The ALJ evaluates age-appropriate functioning within each domain, considering activities that the child is able, or unable, to perform, activities that are limited or restricted compared to like-age children without impairments, in what location the difficulties present themselves, the child's ability to independently initiate, sustain or complete activities, and the kind, quantity and frequency of assistance the child requires to do activities. 20 C.F.R. § 416.926a(b)(2). A claimant with an "extreme" limitation in one domain of functioning or "marked" limitations in at least two domains has limitations that functionally equal the listings. 20 C.F.R. § 416.926a(a). A limitation is "marked" if it interferes seriously with the child's ability to independently initiate, sustain or complete activities, and "extreme" if the impairment interferes very seriously with the child's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2) and (3). In assessing whether a child has "marked" or "extreme" limitation, the ALJ considers the functional limitations from all medically determinable impairments, including any impairments that are not severe, and considers the interactive and cumulative effects of the claimant's impairment(s) in any affected domain. 20 C.F.R. § 416.926a(a) and (c).

## FINDINGS OF THE ALJ

As noted above, the ALJ found that Aaron had not engaged in any substantial gainful activity, and that his impairments were "severe" (tr. 21-22).  At step three of the evaluation process, after considering all of Aaron's symptoms and the opinion evidence, the ALJ determined that Aaron's impairments were not of a severity that met or medically equaled the severity of any listed impairment (tr. 22-26).  The ALJ gave little weight to the findings of Aaron's pediatrician Dr. Tomeh, who opined that Aaron had marked limitations in ADHD areas.  He evaluated functional equivalence in terms of the six domains identified by the regulations and determined that Aaron had "less than marked" limitations in four of the relevant domains: acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being (tr. 24-25).  He further found that Aaron had no limitations in the domains of interacting and relating to others and caring for himself (tr. 24-25).  These findings directed a conclusion that Aaron was not disabled (tr. 25).

## EVIDENCE PRESENTED

Aaron was born prematurely, at 33 weeks gestation, on July 6, 1996 via a cesarean section performed due to maternal hypertension and fetal distress.[1]  He had suspected sepsis (tr. 111-112).

Aaron was treated by M.O. Tomeh, M.D., on January 14, 2002 for cold symptoms.  On March 3, 2003, he was treated for an asthma attack and his mother reported that he showed symptoms of ADHD.  On September 11, 2003, he was again treated for an asthma attack and his mother mentioned that the school was concerned about ADHD (tr. 121-123).

---

[1]The record contains inconsistencies as Ms. Bell apparently reported Aaron's gestational to be 31 weeks.  The court relies on the figure provided by attending obstetrician, Dr. Tomeh.

A Childhood Disability Evaluation Form prepared by a non-examining consulting psychologist on June 18, 2003 reflects that Aaron has a learning disability and asthma resulting in "less than marked" limitations in health and physical well being an attending and completing tasks, and no limitations in the other four domains (tr. 115-120).

Aaron's first grade teacher completed a Teacher Questionnaire on September 27, 2003. At that point, she had known Aaron for approximately one and a half months. Based on this knowledge, she indicated that Aaron had problems attending and completing tasks, but had no problems interacting and relating with others, moving about and manipulating objects, or caring for himself.  She indicated that Aaron had no medical conditions that she knew of, and although Ms. Bell said Aaron had asthma, the teacher did not have an inhaler for him and Aaron did not take any medications at school (tr. 124-130).

On October 24, 2003, Diana H. Gordick, Ph.D. and David B. Rush, Ph.D. performed a consultative psychological examination.  They noted that Aaron had been retained in kindergarten and had been referred to the magnet school for children with learning difficulties he currently attended.  Drs. Gordick and Rush described a child who was pleasant and cooperative, but who was in need of continued placement in a special education program with speech therapy.  His test performance placed him in the borderline range of measured intelligence, although this was deemed to be a low estimate of his intellectual functioning.  Aaron had difficulty with fine motor skills, with pronouncing words and processing verbal information.  His Axis I diagnoses[2] were phonological disorder, developmental

---

[2]Axis I diagnoses report all clinical disorders or other conditions that may be a focus of clinical attention except for personality disorders and mental retardation, which are reported on Axis II. (DSM-IV-TR at 27).  Axis III is for reporting general medical conditions that are potentially relevant to understanding or management of the individual's mental disorders. (DSM-IV-TR at 29).  Axis IV is for reporting psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders, and Axis V is for reporting the clinician's judgment of the individual's overall level of functioning, on a Global Assessment of Functioning (GAF) scale. (DSM-IV-TR at 31, 32)

coordination disorder, enuresis (bedwetting) and rule out mixed receptive-expressive language disorder.  (tr. 131-134).

On December 2, 2003 Aaron underwent a speech and language evaluation. He was described as having a severe expressive vocabulary delay and moderate listening comprehension and oral expression delays.  A certified speech therapist recommended that he receive speech and language therapy, and indicated that his prognosis with such therapy was good  (tr. 135-138).

A second Childhood Disability Evaluation Form prepared by a second non-examining consultant on January 12, 2004 reflected that Aaron had a moderate language impairment, a mild speech impairment, asthma, borderline intellectual functioning and rule out ADHD.[3]  He had marked limitations in acquiring and using information, less than marked limitations in attending and completing tasks, moving and manipulating objects, and health and physical well-being, and no limitation in interacting and relating to others and caring for himself (tr. 139-144).

Records from the Clayton County Public Schools in 2003 continue to reflect Aaron's speech and language difficulties, and his problems with attentiveness and his work habits (tr. 146-159).

Additional records from pediatrician Dr. Tomeh indicate that Aaron had an asthma attack in November of 2003 and was prescribed an Albuteral nebulizer, and was treated for asthma symptoms in December of 2003.  Dr. Tomeh noted asthma at a well-child visit in July of 2004, and further noted "rule out ADD."  In October of 2004 Aaron was noted not to be on ADHD medication yet, as the doctor was waiting for test results.  On November 26, 2004, Aaron was diagnosed with ADHD and asthma and prescribed 10 mg of Adderall.  The dosage of Adderall was increased in January of 2005 to 20 mg. and remained constant through May of 2006 when it was increased to 30 mg. (tr. 172-180, 253-256).  Aaron was diagnosed in July of 2005 as having a sickle cell trait.  A February 2006 entry in Dr. Tomeh's records indicated

---

[3]The qualifications of the consultant do not appear in the administrative record.

that Aaron was not on any medication, but in May of 2006 he was again diagnosed with and on medication for ADHD and asthma.  (Tr. 253-254).

Certified School Psychologist Kristi Bevis prepared a Psychoeducational Report based on evaluations conducted on February 24, and March 3, 2005.[4]  The purpose of the report was "to determine the degree to which attention problems are impacting Aaron's ability to learn and perform in the classroom."  The developmental milestones that Ms. Bell reported to Ms. Bevis were somewhat later than previously reported to other examiners.[5]  Ms. Bevis contrasted the comment on a previous evaluation that said results were likely an underestimate of Aaron's ability due to his inability to pay attention for sustained periods of time, with her evaluation. She noted that in her opinion in light of Aaron's cooperativeness, adequate attention and effort, the results of her evaluation could be considered an accurate representation of his current intellectual functioning.  She determined that Aaron had a full scale IQ of 88.  Results of the California Verbal Learning Test for Children suggested that Aaron's performance on that test was adversely affected by difficulties with attention and showed indicators of ADHD, although Ms. Bevis acknowledged that Aaron was on prescribed medication for inattentiveness at the time of testing.  Her report reflected that two of Aaron's teachers reported a significantly lesser degree and range of behavioral problems than reported by his mother, although problems with attention were consistently reported both at home and in the classroom.  (tr. 196-212).

---

[4]The last paragraph of the report erroneously refers to Aaron by the name of "Craig" instead of "Aaron" although it appears from the context that the full report is about the proper individual (tr. 209).

[5]Ms. Bell reported to Drs. Rush and Gordick that Aaron crawled at 12 months, walked at 17 or 18 months spoke short words at 18 months.  (Tr. 131).  Ms. Bevis's report indicates that Ms. Bell reported that claimant crawled at 22-24 months, walked at 22-24 months and said his first words at 24 months.  (Tr. 197).  A July 2004 evaluation reported that Aaron crawled at 12 months, walked at 22 months and talked at 24-36 months.  (Tr. 246).

In March of 2005, Aaron was placed in the Exceptional Education Program in Troup County, Georgia due primarily to attention problems.  His progress in speech was noted and it was decided that Aaron would receive two segments per day of exceptional education for reading and math, speech services an hour per week and occupational therapy one half hour per week.   (Tr. 221-233).

A Troup County Functional Behavioral Assessment dated March 29, 2005 reflected that Aaron frequently failed to complete assigned tasks, that this behavior always occurred when he was required to work independently, and it never occurred when he was working one on one with a teacher or assistant.  The assessor noted that the behavior could be the result of ADHD (tr. 234-240).

Rivkah Eidex, Psy.D. prepared a written psychological evaluation after meeting with Aaron on July 28, 2004 to evaluate his intellectual, academic, emotional and behavioral functioning.  Dr. Eidex opined that Aaron asserted good effort such that the assessment would provide a valid estimate of his current intellectual, behavioral, and emotional functioning.   Again, Aaron's scores on various tests indicated that his non-verbal abilities were better developed than his verbal abilities.  Dr. Eidex opined that a diagnosis of learning disorder could be warranted.  Aaron's Kaufman Brief Intelligence Score was 82.  Behavioral evaluations indicated that he was functioning at the age equivalent of 3 years and 5 months, but this was based on the Vineland Adaptive Behavior Scales, which was completed by Aaron's mother.  Dr. Eidex speculated that there was possible organic damage based on Aaron's premature birth.  Aaron's Axis I diagnosis was rule out ADHD, Inattentive Type, learning disorder NOS, and enuresis (bedwetting). There was no Axis II diagnosis, the Axis III diagnosis was asthma, hernia and head injury, and Dr. Eidex assigned a GAF of 55[6] (tr. 245-251).

---

[6]A GAF score between 51 and 60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).

Additional records from Dr. Tomeh reflected that Aaron was seen on August 1, 2006 for a refill on his asthma medication and because he was sick. Two days later he sought treatment for asthma and ADHD, and he was treated for asthma and a nose bleed on October 6, 2006 (tr. 267-269).

Dr. Tomeh completed a medical assessment for ADHD on November 1, 2006 in preparation for Aaron's case before the Social Security Administration. He found marked limitations with respect to inattention, impulsiveness and hyperactivity, a slight impairment in age-appropriate cognitive/communicative function, marked impairment in (1) age appropriate social functioning and (2) in deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and no restriction of age appropriate activities of daily living. Dr. Tomeh's final conclusion was that Aaron's condition classified him as having an Attention Deficit Hyperactivity Disorder (tr. 263-265).

On September 13, 2006 one of Aaron's teachers noted that he was having a "great deal of difficulty in social studies and science with existing modifications," and it was decided that although he would participate in classes with his peers, he would take his tests for these subjects in another room (tr. 272).

A hearing was held on November 7, 2006. Aaron testified at the hearing that he was ten years old and in the fourth grade. He said that he was getting A's and B's in school, that he did not have any discipline problems, had friends in school and four siblings. Aaron said that he had seen doctors, but he did not know the doctors' name or why he went to the doctors. When he was specifically asked if he knew Dr. Tomeh, he said that he did, although he did not know how long he had been seeing him. Aaron stated that he was in special education but could not say for how long he had been there, and although he admitted getting held back in the second grade, he denied getting held back in kindergarten. Aaron agreed that he had asthma but indicated that he did not know how often he had problems. When asked if he could read and write Aaron stated that he could write but not read that much, and that he

was unable to read "chapter books" although his friend who was also in the fourth grade in a regular class was able to do so. Aaron was asked several math problems, some of which he answered correctly. He indicated that he helped with chores, he did not know his telephone number or his birth year, although he knew his birth date, he could use scissors but could not stay on a line when he did so. Aaron denied still wetting the bed, although he could not say when that stopped, and he stated that he could brush his teeth, bathe and dress himself unassisted. When asked about focusing, he denied having trouble trying to focus on something for a long period of time. He also stated that at school the teacher sometimes helped him one on one and sometimes taught him as part of the group (tr. 279-292).

Ms. Bell testified that Aaron had been premature, weighing only 3 pounds.[7] She stated that he had been held back in kindergarten and that rather than be retained again the previous year, he had been placed in special education classes for the entire day at the beginning of the school year. Ms. Bell stated that intellectually Aaron was more than two years behind his grade level. She indicated that Aaron had been seeing Dr. Tomeh since birth and under his supervision was currently taking 30 milligrams of Adderall although Dr. Tomeh wanted to increase it to 40 milligrams. Ms. Bell testified that Aaron was having severe behavioral problems at school when the Adderall wore off around lunch time, exhibiting problems with rage, and that his self esteem was very low as a result of his learning difficulties. She indicated that his comprehension seemed to be on the second grade level, and when asked about his limitations, explained that he had extreme limitations in the ability to acquire and use information, extreme limitations in the ability to attend and complete tasks, and extreme limitation in his ability to get along with others. Ms. Bell testified that Aaron was uncoordinated, but getting better. She also stated that she bathed him and had to direct him step by step how to dress himself or he would forget things such as belts and undergarments. She described

---

[7]This contradicts medical records indicating that Aaron weighed 4 lbs. 11 oz at birth (tr. 112).

various injuries Aaron had suffered.  With respect to her son's communication, she said that he did not speak in a lot of complete sentences, that he "misses words" when speaking and his comprehension was "not the greatest." She reviewed instances of Aaron's bowel and bladder incontinence.  Finally, as to Aaron's asthma, she testified that although he takes medication, it is not controlled and he has to go to the emergency room every time he has an attack.[8]  The last time Ms. Bell took her son to the emergency room was two weeks before the November 2006 hearing (tr. 293-309).


## DISCUSSION

The ALJ has clearly set forth the applicable legal standards that he applied to plaintiff's case.  Plaintiff does not appear to contend that there was error in this respect, and the court has found none.  However, plaintiff asserts, essentially, that the ALJ erred in his evaluation of the evidence and that the record evidence supports a finding that his impairments are sufficiently severe to support a finding of disability under the Act.  The issue thus presented is whether the ALJ's decision that plaintiff is not disabled is supported by substantial evidence in the record under the applicable law.

Plaintiff states in his memorandum that he continues to receive special assistance in the Exceptional Learning Program in speech and language therapy as well as writing, and his problem remaining on task continues to hinder his learning ability.  (Doc. 35 at 1).  Plaintiff states that he is taking 30 mg of Adderall for his ADHD but is no longer taking medication for his asthma as the attacks have become almost non-existent.   The plaintiff's appeal appears to be based on his ADHD diagnosis, which he asserts is a disability that will remain a part of him for his lifetime.  It causes his to become hyperactive, anxious and unfocused, unable to sit for long periods of time, and causes marked and severe functional limitations.

_____

[8]There are no emergency room records in the administrative record.

The ALJ's consideration of the evidence

Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; see also *Lewis*, 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. 404.1527(d).

The ALJ's decision was based on his determination of the plaintiff's level of impairment in each of the six domains of function. In weighing the evidence presented, the ALJ gave little weight to Dr. Tomeh's finding that Aaron had marked

limitation in ADHD areas. (Tr. 263-265). His rationale for doing so was that although Dr. Tomeh was a treating physician, he was not a psychologist or psychiatrist, but rather a pediatrician whose expertise was not in the mental health area, his notes reflected that his focus was on plaintiff's physical health, and finally, his opinion was inconsistent with the overall record.

On the Medical Assessment for ADHD form, Dr. Tomeh noted "marked" when asked about the degree of Aaron's inattention, impulsiveness and hyperactivity, indicated that Aaron had "marked" impairment in age appropriate social functioning and "marked" deficiencies in concentration, persistence or pace, "slight" impairment in cognitive/communicative function and "no impairment" in age appropriate activities of daily living. Dr. Tomeh indicated that in his opinion Aaron's condition classified him as having an ADHD disorder, but contrary to the instructions on the form to provide "any and all objective findings" to support his conclusion, he offered none (tr. 264). When asked if he would be willing to provide answers to additional questions if the need arose at a later time, he indicated that he would not (tr. 265).

In contrast, School Psychologist Ms. Bevis, and Dr. Eidex, a licensed clinical psychologist, determined after evaluation that claimant had an IQ of 88 and 82 respectively, and Dr. Eidex assessed a GAF score of 55, equating to a moderate difficulty in social or school functioning. Their assessments provided great detail about plaintiff's abilities and functioning (tr. 203). There was substantial evidence supporting the ALJ's decision to discount Dr. Tomeh's opinion.


The ALJ next reviewed the plaintiff's limitations in the six domains of functioning. In order to be functionally equal to a listing, plaintiff must have a marked limitation in two domains of functioning or an extreme limitation in one domain.

1.  <u>Acquiring and Using information</u>

This domain considers how well a child is able to acquire or learn information, and how well a child uses the information he has learned. The ALJ found that claimant had a less than marked limitation in acquiring and using information due to his ADHD and speech problems.  Plaintiff's first-grade teacher noted that his speech was "almost all" understandable, the highest rating for that question (tr. 127).  School psychologists noted in 2003 and 2005 that plaintiff's intellectual functioning was within the average range (tr. 203-205; see also tr. 156 noting average intelligence and a composite IQ of 90).  The special education services he received were primarily for his attention problems, rather than learning difficulties (tr. 20, 224, 242).  In September of 2006 when plaintiff's teacher reported that he was having difficulties in social studies and science, the remedy was not to remove him from the classroom, but rather to allow him to take the tests in a separate area.  Thus, there was substantial evidence to support the ALJ's conclusion that plaintiff's limitations in this domain were less than marked.

2.  <u>Attending and Completing Tasks</u>

This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities.  20 C.F.R. 416.926a(h).  The ALJ found that Aaron had a less than marked limitation in attending and completing tasks due to limitations from his ADHD. Although Aaron's problems in this area were what led him to be placed in special education classes, when in this setting, he appeared to be doing better.  While on medication he exhibited mild ADHD symptoms. The psychosocial educational report concluded that he was able to inhibit his behavioral impulses, to transition mentally to different kinds of activities and to exhibit appropriate control over his emotions (tr. 203).  A March 2005 behavioral assessment showed a failure to complete tasks

when working independently, but not when working with a teacher or assistant (tr. 234-235). Thus, there was substantial evidence to support the ALJ's conclusion that plaintiff's limitations in this domain were less than marked.[9]

3. <u>Interacting and Relating with Others</u>

This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. 20 C.F.R. § 416.926a(i). The ALJ found that Aaron had no limitation in interacting and relating with others. Examining psychologists consistently reported that Aaron was pleasant and cooperative, and he testified that he had at least one friend he saw outside of school. Although his use of language was somewhat delayed, he was able to communicate, and the ALJ found that his testimony at the hearing was age appropriate for the setting. Ms. Bell testified at the hearing that Aaron had problems at school when his ADHD medication wore off but this is the only indication of this issue. None of the school records mention it. Hence the ALJ's determination on this issue is supported by substantial evidence.

4. <u>Moving about and Manipulating Objects</u>

This domain considers how well a child is able to move his body from one place to another and how a child moves and manipulates objects, a child's gross and fine motor skills. 20 C.F.R. 416.926a(j). The ALJ found that Aaron had a less than marked limitation in moving about and manipulating objects due to his asthma. There was some record evidence that Aaron was clumsy, but the "injuries" described by his mother at the hearing appeared to be typical childhood injuries not necessarily related to any of Aaron's limitations, perceived or otherwise. He testified that he was able to ride a bicycle and able to write and was planning to play football.

_____

[9]The court recognizes that this is the domain with the strongest argument of error. However, even if plaintiff's limitations in this area were to be found "marked," a finding of a marked limitation in a single domain would not support a finding that plaintiff is disabled.

The ALJ's finding that plaintiff's limitations in this domain were less than marked is supported by substantial record evidence, and to the extent any degree of limitation was based on Aaron's asthma, such limitation has now been removed.

## 5. Caring for Yourself

This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways. This includes how well the child copes with stress and changes in the environment and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. 416.926a(k). The ALJ found that the claimant had no limitation in the ability to care for himself. Plaintiff's first-grade teacher observed no limitations in this area (tr. 128), plaintiff's demeanor was consistently calm, pleasant and cooperative during psychological evaluations (tr. 132), and a school psychologist assessed plaintiff's social and emotional functioning to be within the average range (tr. 205). Plaintiff was able to be physically active, and dressed himself with reminders (tr. 300-301), and had made friends (tr. 282, 286). The ALJ's conclusion that plaintiff had no limitations in this domain was supported by substantial record evidence.

## 6. Health and Physical Well Being

This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. 20 C.F.R. 416.929a(1). The ALJ found that Aaron had asthma, but nevertheless had a less than marked limitation in health and physical well-being. There was record evidence of three asthma attacks in 2003 (tr. 180-182). Aaron's health seemed to improve over time as there was evidence of asthma symptoms but no medical evidence of attacks in 2004, 2005 and 2006, and he is currently off

asthma medication.  The ALJ's conclusion that plaintiff's limitations in this domain were less than marked was supported by substantial record evidence.

Based on the foregoing, it is respectfully RECOMMENDED that the Commissioner's decision be AFFIRMED, that judgment be entered in favor of the defendant, and that the clerk be directed to close the file.

At Pensacola, Florida this 19th day of January, 2010.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).